Good morning. Christopher Morris on behalf of plaintiffs and appellants, Sandoval family. I'd like to let the court know that the Sandoval family is present in the court today. Your Honor, when I was in, your honors, when I was in law school a day, a professor told me that when you, in law, when you define the question, you define the answer. And I think that that's especially true in this case. And the three constitutional questions that were before the district court in the summary judgment motion, I think the court unfortunately asked either a definitely a too narrow of a question or simply asked the wrong question. When it came to a substantive underlying constitutional violation, the court refused to adopt the objective analysis set forth by this court in Castro. When it came to the qualified immunity analysis, the court didn't pay any attention to the state of forward analysis and how this court recently clarified how that question should be asked in Horton and asked a very, very narrow question. And when it came to the Monell question, the court simply inserted a Canton element into the Monell analysis by requiring plaintiffs to prove a pattern and notice. All three of those were wrong and all three of those demand a remand. If the standards were still the subjective deliberate indifference standard, do you challenge the district court's determination that there was not a triable issue on the subjective element? I do. I do, Your Honor. I do because, well, let's break down the three The critical question then becomes, which is a very disputed fact and on that issue alone should go back, but the question then becomes at that critical moment when those officers bring him up and they say he's sweaty, lethargic, and confused and he needs to be thoroughly evaluated and he says that he may have diabetes but his blood sugar is fine and the nurse checks him for diabetes and there's a conversation that's had. And in that conversation, those officers put in their report that they came to the conclusion that he had drugs on board. He had drugs on board because he was sweaty, shaking, confused. There is no direct evidence. I hate to interrupt you, but during that encounter with the nurse, I'm not clear in the record, did the nurse take his blood pressure or do any evaluation of him other than checking his blood sugar? Ten second blood sugar eval, that's it. Ten seconds. And after that eval, he cleared him for booking. He said no, take him back to booking. The guy's still in his street clothes. And the officials, the deputies, to their credit said no, no, no. He needs to stay here to be thoroughly evaluated. And they came to the conclusion that he had drugs on board. The reasonable inference, which needs to be just one? One. Six hours, Judge. He knew that your client was still in detention and was in a special detention area. You can see the video. And then Guzman never told the follow-on nurses about that status and never passed him off until after one of the officers noticed that he was an extremist and then they called the second set of nurses. Correct. Okay. What about Harris? Because as I understand your theory about Harris is that she was so incompetent, she didn't even understand the distinction between the, you know, the ACLS and the other, and she didn't even appreciate subjectively why she needed to call 911 rather than EMTs. But if that's true, and I understand that argument with respect to the objective standards, but if that's true under the prior subjective test, it would seem that she did not have the subjective difference and there isn't a tribal issue there. But then you go back to Malley versus Briggs. Okay. And the, and the Supreme Court said, you can't, qualified immunity does not protect the plainly incompetent. And then you go back to Gibson versus Washoe and Conn versus Reno, where this court said, if it's painfully obvious, if it's so obvious that anybody would know. That's all objective. Right. But that, but those take you outside of qualified immunity. If it's so painfully obvious that anybody, any reasonable practitioner would know, then the subjective element doesn't come into play because it's so obvious. Now, can it be the case that someone under the old law would have no liability because she did not have the requisite subjective intent, but nonetheless lacks qualified immunity? I thought qualified immunity always subsumes within it someone who in fact would have no liability under the then existing law. That's interesting where you have the subjective element with the, with the qualified immunity objective overlay. And that's what this court recently addressed in Horton when it said, based on the available case law, would a reasonable practitioner know that failing to render medical aid would create a substantial risk of harm. But what's different in Horton and a state of Ford is in both of those cases, we started from the predicate assumption that there was a triable issue on the subjective element. And then we characterize the remaining qualified immunity question as driven by the objective. But you don't have that first part here. And we've emphasized that in both of the subjective element plays in particularly in the Harris situation. Well, in Harris, Your Honor, we do have a very hotly disputed issue with respect to whether he was seizing or not. You've got Sergeant Shawcroft, Deputy Edge, Deputy Andrade, all saying the guy is seizing, seizing the entire time. Conversely, you have Harris who says he's not seizing, he's not seizing. So I think that's the hotly contested issue. If she appreciates the seizing, then automatically she needs under all the policies and everything else to call 9-1-1 and not EMTs. EMTs couldn't do anything for this individual. It was 9-1-1 that needed to be called. It was over an hour before the EMT showed up, or before the 9-1-1 paramedics showed up. 47 minutes. 47 minutes, yes. 47 minutes. And our expert will tell you, you get him to me in an emergency room setting with his heart beating, I'll save him no matter how much meth he ingested. You get him to me dead, I can't. Well, you paid that expert well, but I understand that's a credibility issue. I think at this stage in the game, we're entitled to that deference. So, and I appreciate the court's concern on that, on the subject element, but I think if you look at the State of Ford case and the Harris case, or excuse me, and you look at State of Ford and Horton, the proper analysis is you take the subjectivity out and you say just ask the question that's given the available case law, would a reasonable practitioner know that failing to render medical aid in this situation created a substantial risk of harm? And it's an adequacy question. You have to go back to Taguchi v. Chun and Hamilton v. Indo when you talk about the adequacy of the medical care that's provided. Go ahead. But if that's true, then what you're saying is that we would deny today qualified immunity to someone who, in fact, had no liability under the subjective test that governed at the time they acted. Well, your honor, I would say a survey of the relevant case law that existed prior to this, where there's three cases, four cases I've cited at the court where an unconscious individual is not provided the life-saving measures they need and they're like five or six or seven minute delays and they found that qualified immunity didn't apply. I would say that clearly applies to Nurse Harris. Those clearly apply to Nurse Harris. And that's Kerr, excuse me, Kelly v. Borg, Lemire v. CDC, and McRaven v. Sanders, all Ninth Circuit cases, all in the 2000s and 1990s that say, hey, you got an unconscious individual, you got to provide them life-saving measures. So the qualified immunity analysis, I think, if you look at what was available, and I think nobody here is disputing, I don't think, that if they know that this guy is overdosing or has drugs on board, he's entitled to reasonable medical care. And I think the reasonable inference that plaintiffs are entitled to in this case is that Nurse de Guzman knew. And we know that for two reasons. One, immediately after the blood test analysis, he asked for him to be put back into booking and they say no. Shortly thereafter, the report says he asked for him to go to a sobering cell. He doesn't ask for him to go to a sobering cell unless he knows he's got drugs on board. Second, the night of the incident, there's a death investigation, and they tape his recording. And I bring that up, it's erroneously cited in the brief at ER 63, but it's ER 141 and 142. And in those, in that deposition, I ask him, I play his tape, and I say, you say the I thought he was under the influence. That's what you said, right? And he says that's right. So he formed the opinion, came to the conclusion he had drugs on board. Drugs were going, drugs are what was causing the sweating, the lethargy, and the confusion, the shaking. So I think when it comes to Nurse de Guzman, qualified immunity just doesn't protect that sort of incompetence. Six hours, your honors, six hours, you can see Nurse de Guzman at his computer with Ronnie Sandoval 20 feet away in a glass cell looking through the cell and never being checked for six hours. And deputies had come up to him and said, you need to thoroughly evaluate this man. We have to take him out of booking. And you had a guy sitting in a cell in street clothes for six hours, not ever being checked. That is the epitome of deliberately indifferent. That is the epitome of inadequate medical care. That type of behavior should not be protected by qualified immunity. That's not what that's about. Qualified immunity isn't about protecting somebody who makes a conscious decision to do nothing because, quote, in his deposition, I didn't have to. And why was the cell that was set up for? Sometimes it's medical, sometimes it's punishment, sometimes it's housing. And until somebody makes a definitive decision to tell you what that cell is for, nobody has a responsibility to do anything. And that's the third prong where the court got it wrong. The court said, you got to show that there's previous deaths or constitutional violation adjacent to that cell. That's a Canton element. You don't have to show a pattern or notice. This is a direct policy. You've got a policy that says you ignore individuals in that cell unless told otherwise. And what happened in this case was bound to happen at some time, which is there's confusion. Okay? Mr. Guzman says, they never told me to check him. The deputies are saying, that's not true. We told you he need to be thoroughly evaluated. And they document it in their report. But that's the kind of confusion that's inherent in a cell such as this, where there's no clear definition of what the responsibilities are and to whom. Juxtapose that when you have like a sobering cell or a medical cell where there's definite lines and demarcation about what they're supposed to do. And here you've got the cell off to the side, where unfortunately Mr. Sandoval decompensated. And without being checked for eight hours, six by Nurse de Guzman, two by the follow-on staff, that's what happened. And those are violations, clear violations of the Constitution that really need to be addressed and need to be given a fair shake in front of a jury. And unfortunately we weren't able to do that. Do you think, you don't think remand for the District Court to apply Gordon is necessary because your position is that GR, even if the subjective standard was still in place? I don't think a remand to apply Gordon should happen for two reasons. One, I think it's plainly incompetent. And I think under Malley v. Briggs, qualified immunity doesn't protect the plainly incompetent. And we can sidestep qualified immunity and just say, hey, these people didn't know what was going on. And they're plainly incompetent and you don't protect it. Two, even if, even if we provide Gordon v. Briggs on the underlying constitutional violation and then we get the qualified immunity and apply a proper analysis under Horton, I don't think, I think the court could at this stage in the game make those kind of findings and allow us to sidestep any further motion work and just go to trial. That's what I'm hoping. And it saves some of your time. I do. I thank you. Thank you very much. I reserve the rest of my time for rebuttal. Thank you. Thank you. Good morning and may it please the court. My name is Fernando Kish and I represent the District of Columbia. Did the jail nurses make a mistake in their medical judgment in treating and providing medical care to Mr. Sandoval? The Constitution does not and should not answer the question. Mr. Sandoval died of a massive methamphetamine overdose. He swallowed the methamphetamine just before being arrested to hide it from the arresting officers and to avoid criminal charges. He intentionally concealed it. So he should get the death penalty for that? No, Your Honor. Okay. But it does form the information, part of the information that's available to his jailers and the jail nursing staff. But he's arrested for drug possession, isn't he? Yes, Your Honor. He's on probation. For drug possession? Correct, Your Honor. And he's arrested for violating his probation for drug possession? Correct, Your Honor. So you know he's a drug user? The arresting officers, yes, Your Honor. And they think he's violating his probation because he's using drugs? That's correct, Your Honor. Drug possession, correct. So you know you got a drug user? The arresting officers do, yes, Your Honor, without a doubt. And so does the nurse. All three nurses ought to know that because they have the booking sheet, right? The nurses don't necessarily have the booking sheet available to them, Your Honor. Oh, come on. They can't look at the jail record and know what the guy's booked for? The question can and the question did are two different questions, Your Honor. Whether the information is available to them is different to whether they actually did look at the information. And in certain instances... And it's a fact question as to whether the jailers told the jail nurses that they thought he might have drugs on board. I disagree with that, Your Honor, for a couple of reasons. First, the evidence that plaintiff is relying on to make that point is the officer's reports. The district court sustained the defendant's objections to that report because plaintiffs failed to respond to the allegations. They failed to respond to the evidentiary objections during the motion for summary judgment proceedings, Your Honor. The plaintiffs haven't preserved that issue here on appeal except for a footnote in their opening brief. If the court were to consider that issue, it would have to consider it under an abuse of discretion standard. There's no evidence that's been presented to this court that the district court erred as a matter of law in refusing or sustaining the evidentiary objections by the defendants. The evidentiary... The evidentiary... Excuse me. The evidentiary objection was what? Foundation and hearsay, Your Honor, and relevancy. It was to the... The motion for summary judgment there's an objection for foundation, hearsay, and relevancy. Yes, Your Honor. Okay. All right. And those are the statements by the officers. The officer's report, as opposed to their report, should be considered. In addition to that, I think Your Honor asked a question about the plaintiff's well-paid expert. An evidentiary objection to that... Just being a little facetious. I was an old medical malpractice lawyer, so I understand this better than most. Go ahead. An evidentiary objection was also sustained to that report. I was a little troubled by the objections myself and the exclusion of the expert report because, I mean, at summary judgment stage, the standard for admission is what you could show at trial. It's not necessarily what's admissible now. That's correct, Your Honor, but under our local rules, the court, the district court, has within its power the ability to exclude evidence if the party fails to respond to an evidentiary objection. That's what happened in this case. Aside from that, even if we were to consider the entirety of the evidence, I think the plaintiff's report should be considered. I think the plaintiff's report should be considered. The testimony was that he was brought up to the second floor, is where de Guzman is, if I understand this correctly, and told that he needs a thorough evaluation. So we can take that as established for the summary judgment. That evaluation didn't occur. Maybe if it had occurred, his condition might have been discovered. He had a 10-second blood draw. What is your response to that? Your Honor, the deputy did come up and informed the nurse of certain facts, that Mr. Sandoval appeared lethargic, was confused, and was sweating. And didn't the officer say that he thought he needed a thorough evaluation? Whether he used the word thorough or not, I'm not sure, but certainly that he needed to be evaluated. That's the whole purpose of taking him to the second floor. And did Guzman do that evaluation? Yes, Your Honor. It was also colored by the fact that the reason for asking for the evaluation is because Mr. Sandoval reported to the deputy that he was diabetic. And so the officer thought it would be a good idea to get a second blood sugar test, because he had already had that done on the first floor. Nurse de Guzman does perform that blood sugar test. And during that blood sugar test, he is having a conversation with Mr. Sandoval, asking certain questions to determine whether he is fit for booking or not. Based on de Guzman's evaluation, whether it's 10 seconds or not, he sees someone that is alert, that is ambulatory, that is coherent. I didn't see. Is there a medical record that Nurse de Guzman did concerning his evaluation of the patient? I don't think that's in the record, Your Honor. Because there is none. Again, Your Honor, it's not in the record. I don't know whether there is one or not. You should also know I used to represent jail nurses, so I think I am familiar with how they operate. I'm just curious about this mixed-use cell. Does the county still have a cell that's like this? This is a medical observation cell that was and could be used for mixed purposes, Your Honor. The issue that plaintiff brings to that point is that there might create some confusion in certain instances. And even if there is some confusion... But what does it mean to be a mixed-use cell? A mixed-use in this context, Your Honor, means that it could be used for a medical purpose. Meaning someone needs to be put in that cell because there is a medical reason that requires some further attention. The alternative use or the dual purpose is that if someone is just there for a law enforcement purpose, meaning there's not enough room in another cell or they're there just temporarily while they're moving someone else out, that's the mixed-use component of that observation cell. But regardless of the intended purpose of why Mr. Sandoval was in that cell, the fact remains, and it cannot be disputed, that it was a medical observation cell, which means it was a plexiglass front door. You could see through it. It was directly across the nurse's station in a high-traffic area. The plaintiffs argue that Nurse de Guzman never checked on Mr. Sandoval during the remainder of her shift. That's true, that he did not physically go into the cell and have a conversation with him. However, in his declaration that was submitted with the motion for summary judgment, he did testify that he was able to observe Mr. Sandoval during the duration of his shift at least three separate times, including at the end of his shift, and he saw Mr. Sandoval not in any medical distress, sitting upright. There's simply no information that Nurse de Guzman had at his disposable that suggested to him that this man was in medical distress. None of the deputies suggested that this person needed to go to the emergency room. At the very worst, the deputies suspected the possibility that there may be drugs on board, but none of them suspected that there was a lethal amount of methamphetamine that he had just swallowed. Some of them believed that maybe it was withdrawals, which is the opposite of being intoxicated, and which present itself with different symptoms. So the record is silent on whether there had been any previous incidents where this so-called confusion for mixed-use cell occurred. Is that because that was never developed, or because there's never been a problem with these mixed-use cells? There's no evidence of any prior incident regarding this medical observation cell that's in any way analogous to the issues that are before this Court. With respect to Nurse... I should also point out that failing to discover Mr. Sandoval's lethal dose of methamphetamines was in part caused by Mr. Sandoval himself. He was concealing that information. He was repeatedly asked, do you have drugs on board? Did you take any drugs? As to Nurse Harris, plaintiffs criticized her for being incompetent. Now, she started her shift at 11 p.m., and when she started her shift, she had no advanced information of Mr. Sandoval's condition. She observed him within 20 minutes of her shift and didn't notice anything out of the ordinary. He was not in medical distress at that point. When Mr. Sandoval was noted to be in medical distress by a sergeant passing by, that was the first time that there was any serious medical condition known by anyone at the jail. When that occurred, Nurse Harris responded immediately. She went in there and made an immediate call for emergency transport to the emergency room. She was the first responder, and as the first responder, she never left that cell and was in constant observation of Mr. Sandoval. I thought she called the EMTs first. She just called internal staff first. She didn't call the paramedics. It wasn't internal staff, Your Honor. It was EMT. In the jail, they have the availability of either calling EMT for transport or paramedics for transport. Oh, okay. So either way, it was a transport issue. Right. She recognized right away that this man needed to go to the emergency room. There's no dispute about that, and she made the call right away. And that call was made, and EMTs did arrive within, I think, approximately 20 minutes. Okay, so I guess I don't understand. So tell me what the chain of events are. She goes in, Nurse Harris goes in, calls the EMT, the EMTs come, and they decide that they need paramedics? And then after they decide they need paramedics, then another squad comes? And then now we've got an hour and 15 minutes or so before his heart stops, while he's en route or while he's in the jail? Let me see if I can get the timeline right, Your Honor. Approximately 1255, there's the man down that's noted by the sergeant that's walking by. Nurse Harris is in the room by 1258, probably sooner, but that's when she approximately is making the call to the emergency transport for this man to be sent out to the emergency room. Now here, there's a question about how quickly she realizes whether or not she needs to call for paramedics. It's important to consider her role in this case. She is the first responder, and because she's the first responder, she's in constant observation. Compare that to the deputies that may be coming in and out of the cell and focused on other things. And most importantly, compare that to Nurse Yamato, who specifically steps out of that room because she's in an assistant role in that point. She steps out to retrieve the suction machine. She steps out to look up the computer information about this man. She steps out to call the charge nurse and explain what's going on. You're not answering my question, and you're running out of time. So what's the chain of events for the EMT versus the paramedics? Do two squads call? Yes. Okay, and then that's the delay? Yes, Your Honor, and the delay at the very... And then they lose pulse en route or in the jail? I think they lose pulse in the jail, Your Honor. Okay. The delay at the very outside estimate, Your Honor, is a delay of between 10 to 20 minutes between the time that nurse... He's discovered by the sergeant at 1253, and he loses his pulse and pronounced dead at 211. That's the correct chain of events, yes, Your Honor. The question here, for purposes of Nurse Harris, is how long did it take her to decide to call paramedics? But it's uncontested. She didn't even know the difference between ACLS and BLS. Is that right? That's correct, Your Honor, but that wasn't what was motivating her decision. What was motivating her decision is her observation. For instance, she asked the man questions, squeezed my hand, and she received a response. But isn't this all fact questions? I mean, you're confusing me on these facts because I kind of recall the facts slightly differently than what you're saying, but in any event, it's still a factual question for the jury. I think those... There's some factual questions for the jury in a medical malpractice claim, but as to whether or not this rises to the level of a constitutional claim, it's a different standard. You have immunity for a medical malpractice claim, don't you? Or not? Not to my knowledge, Your Honor, under these... You just don't have immunity. Correct, Your Honor. And the state... I thought Nurse Harris was told to call the paramedics by people who understood that the paramedics had life-saving equipment and the EMTs didn't, and yet she did not call them when she was told to do that. Deputies expressed an opinion that paramedics should be called. Nurse Harris is the medical provider. She decided, based on her observation, that this man was conscious and doing certain things that suggested to her some responsiveness, and that's spelled out in the record. Nurse Yamato expressed the opinion that paramedics should be called, but again, that was on a picture that was less complete than a Nurse Harris's picture. That's the reason why Nurse Harris did what she did. Plaintiff calls that incompetence, but that's just a difference of opinion based in part on different information that the nurses had at their disposal. Ultimately, Your Honor, Section 1983 is intended to prevent abuses of governmental authority, to disturb state actors from using their badge of authority to deprive individuals of important rights. At the very worst, this case presents a claim of medical malpractice. It started in state court as a medical malpractice claim. It should return there and end there. Thank you very much. Thank you, Counsel. Mr. Morris, I think you had... Right, thank you. I'll be quick, Your Honor. Your Honor, I'd just like to begin where the court left off with Nurse Harris. Ten times she was told to call paramedics. Ten times she was told that EMTs couldn't do anything. They couldn't do advanced cardiac life support. They couldn't transport him in this condition. This is a complete waste of time. She arrives at 1258. EMTs are finally called at 105. And when the EMTs get there and say, we can't do anything with him. We can't transport him in this condition. At 130, after ten times being told to do it, they finally call paramedics. And that's where the delay is. They call an EMT and say, I am an EMT. We can't do anything with him. You need a paramedic who can push meds, who can do cardiac life support. It's interesting that they defer to Nurse Yamato. Nurse Yamato, they said she didn't have a complete picture. She immediately arrived, looked at him and said, he needs to go out 911. Immediately. She could just tell by looking at him, he needs to go out 911. Unfortunately, and she was honest as she could be, she said, I screwed up. I should have called 911. I shouldn't have deferred to her. I should have called 911. And she was heartfelt about it, heart sick about it. Her honesty doesn't immunize her in this situation, unfortunately. But she knew right away that this guy needed to go out 911, that EMTs couldn't do anything about it. Well, I'd point to the court that the cell situation has been remedied. That's the state of the record. They now change the cell policy. That cell doesn't sit there with a mixed use, who knows what it's for, policy anymore. And under Henry versus Shasta, that's relevant. Post for mental health purposes. Is there a local rule in the Southern District that says that if you don't respond to objections, they're deemed sufficient? We relied on solar versus County of San Diego where this issue had actually been litigated and where the court said, no, you can't exclude police reports at summary judgment. You can't exclude rule 26 reports at summary judgment. It was a blunderbuss objection. I think district court would have found a way to try to exclude the evidence we needed no matter what. The state of the law is so clear that at summary judgments, police reports, rule 26 reports, they all come in, whether they're signed under penalty of perjury or not, which is another reason the court excluded the experts. It was just the kind of thing where the judge was going to do what he was going to do. I don't think there's much we could have done. You're right. Next time in front of this court, I will definitely respond to the objections even though the law is clear otherwise, but point well taken. I tend to agree with you that some of the objections were frivolous. It was just crazy like this blunderbuss of all these objections. I agree. I was just wondering if there was an explicit local rule because we couldn't find one. I didn't see one. I didn't see one, but this judge is particular. I've never had anything excluded for not responding to frivolous objections. You're over your time now. Thank you so much. Thank you, counsel. Sandoval v. County of San Diego is submitted   for comment.
judges: Wardlaw, Bataillon, Collins